Robert P. Robichaux and Barry R. Robichaux, lower landowners, sued AFBIC Development Company ("AFBIC"), an upper landowner, alleging a wrongful alteration of the flow of natural surface water onto their property, which they alleged caused injury to their property. They sought damages under the theories of trespass and nuisance. AFBIC filed a motion for summary judgment, which the trial court granted. The Robichauxs appealed. We affirm.
We recognize the common law right of a lower landowner not to be injured by an upper landowner's interference with the natural drainage of surface water onto the lower property. An alteration in the natural flow of surface water would be a wrongful interference with the lower landowner's possessory rights and could constitute trespass or nuisance. See Ala. Code 1975, § 6-5-213; Kay-Noojin Development Co. v. Kinzer, 259 Ala. 49, 65 So.2d 510 (1953); Sargent v. Lambert Construction Co.,378 So.2d 1153 (Ala.Civ.App. 1979); see also Mitchell v.Mackin, 376 So.2d 684 (Ala. 1979); Borland v. Sanders Lead Co.,369 So.2d 523 (Ala. 1979); and City of Mountain Brook v.Beatty, 292 Ala. 398, 295 So.2d 388 (1974). *Page 1018 
Summary judgment for a defendant is proper when there is no genuine issue of material fact as to any element of a cause of action and the defendant is entitled to a judgment as a matter of law. Rule 56(c), A.R.Civ.P.; Wilson v. Brown, 496 So.2d 756
(Ala. 1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381
(Ala. 1986). If there is substantial evidence of every element of a cause of action, summary judgment is inappropriate in the absence of some factually undisputed defense. Ala. Code 1975, §12-21-12; Perry v. Hancock Fabrics, Inc., 541 So.2d 521 (Ala. 1989). In determining whether there is substantial evidence of every element of a cause of action in this case, this Court must review the record in a light most favorable to the plaintiffs and must resolve all reasonable doubts against the defendant. Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala. 1986).
In support of its motion, AFBIC introduced a document granting an easement from the Robichauxs' predecessors in title, William M. and Norma T. Watts, to the City of Montgomery ("City"); the deed from the Wattses to the Robichauxs; and an affidavit and deposition of George Goodwyn, the engineer who prepared the plans and specifications for the City's requirement for an overall storm drainage system for Fox Hollow Subdivision ("Subdivision") in the City of Montgomery. AFBIC is the developer of the subdivision, which was developed in four phases with each phase represented on a separate plat. As required by the City for the development of the subdivision, AFBIC purchased a standard city storm drainage easement, buying it for $14,000 from the Wattses, who were the predecessors in title and the owners of the adjoining property. The easement document, issued with the name of the City as grantee, in pertinent part reads as follows:
 "Whereas, there is installed and in place . . . a surface water drainage pipe system, the terminus of which is located approximately 160 feet north of the southeast corner of said subdivision, and
". . . .
 "Whereas, the said land of the Grantors receives surface water from said surface water pipe system; and
 "Whereas, it is the desire of the Grantors to convey to the [City] the right and privilege of discharging, spilling, dumping or draining onto the lands of the Grantors surface drainage water from the aforesaid surface water pipe system;
. . .
 ". . . Grantors do hereby GRANT, BARGAIN, SELL and CONVEY UNTO THE [CITY] . . . the right and privilege of discharging, spilling, dumping or draining surface water onto and across the lands of the Grantors located in the [City].
". . . .
 "It is expressly understood and agreed that the undersigned [the Wattses] reserve . . . the right and privilege, upon the development of their land . . . or at any time they . . . shall deem it desirable so to do, to alter the flow of such drainage with the understanding, however, that the said surface water herein provided for shall be received and allowed to be discharged, spilled, dumped or drained into such altered system of drainage." (Emphasis supplied.)
Thereafter, the City approved the plans for the development of phases three and four of this subdivision. These plans and the spillage easement have been on file with the City since 1974.
When phase three was planned and built in 1979, the storm drainage system consisted of a 30-inch concrete drainage pipe, running to within 150 feet of the alleged terminus point, where it joined a natural ditch that took the water onto the Robichaux property.
AFBIC contends that the current terminus point (160 feet north of the southeast corner of phase four), adjacent to the Robichauxs' property, from which point the water flowing onto the Robichauxs' property is discharged, complies with the terms of the easement and the plans for the development of the subdivision as approved by the City and that there is no genuine issue of material fact as to an alleged unlawful *Page 1019 
interference with the flow of surface water onto the Robichauxs' property, which is a necessary element of causes of action for trespass and nuisance. We agree.
The well-settled law in Alabama is that "one who purchases land subject to, or with notice of, an easement, takes the land subject to that easement." See Bruner v. Walker, 366 So.2d 695,696 (Ala. 1978). The recorded deed conveying the property from the Wattses to the Robichauxs shows that the Robichauxs purchased the property subject to the easement; therefore, they had actual knowledge of that easement. Furthermore, the easement was properly recorded in the Montgomery County probate office. That recording constituted constructive notice of the express terms of the easement. Ala. Code 1975, § 35-4-51; Uptonv. Mississippi Valley Title Ins. Co., 469 So.2d 548 (Ala. 1985). The Robichauxs had both actual and constructive notice of the easement and took the property subject to its terms.
The Court must look to the written easement to determine the scope of the grant. City of Montgomery v. Maull, 344 So.2d 492
(Ala. 1977); Consolidated Foods Corp. v. Water Works SanitarySewer Bd. of the City of Montgomery, 294 Ala. 518,319 So.2d 261 (1975).
 "In Cobb v. Allen, 460 So.2d 1261, 1264 (Ala. 184), this Court stated the following guidelines for defining an easement:
 " 'The determination of the extent and reasonableness of use of an easement created by express grant involves a number of basic principles: If the language of the grant is clear and free from doubt, such language is not the subject of interpretation. If subject to interpretation, the extent of the easement depends on the intention of the parties as gathered from the terms of the deed and the situation of the land. If there is further doubt as to the intent, it may be determined from the practical construction of the grantor and the grantee and their successors in title. A grant of easement will be construed in favor of the grantee.' "
Byerley v. Griffin, 512 So.2d 91, 92-93 (Ala. 1987) (emphasis supplied); see also City of Montgomery v. Maull, supra; Alonzov. Sanford, 465 So.2d 1131 (Ala.Civ.App. 1984).
"[T]he right and privilege of discharging, spilling, dumping or draining surface water onto and across the lands of" the Robichauxs is the language of the grant. No amount is specified, and it appears that the language of the grant is clear. However, in opposition to the motion, the Robichauxs argue that the easement is ambiguous and should be construed in their favor. They argue that the phrase "there is installed in place . . . a surface water drainage pipe system" could mean nothing other than that the system was physically located on the property and could be visually inspected at that particular time; that the privilege of discharging water was granted through the existing system and through its terminus as it existed at that particular time. Contrary to what the Robichauxs argue, the grant of the easement should not be construed in their favor, because they stand in the place of the grantor of the easement, but should be construed in favor of the grantee of the easement. Byerley v. Griffin, supra. Assuming for the sake of argument that the grant is subject to' interpretation, we then look to the affidavit and pertinent parts of the deposition testimony of Goodwyn, the engineer who prepared the plans and specifications to comply with the City's requirement for an overall storm drainage system for the entire subdivision. He stated:
 "A. . . . [W]e prepare an easement in the plans for the development of a subdivision and the City detail checks the storm drainage calculations of all the water runoff for the plans; and based on these engineering plans, the City requires a storm drainage easement.
 "That's what this document provides for, is the right to discharge water off the property. . . . We have to submit the entire plan for the whole drainage system. And that's what that storm drainage easement was for. . . . *Page 1020 
". . . .
 "A. From the very beginning, 1970, I guess — whenever the system was started, the whole development — an entire storm drainage system was planned for the entire area back at the very beginning.
 "Q. Okay. So an overall system was planned early?
"A. Right.
"Q. — when the first development started?
"A. Right.
 "Q. All right. And in 1979, it would have been partially completed?
"A. Right.
". . . .
 "A. The City required a storm drainage easement. As part of Plat Three, the pipe was put into the out limits of Plat Three. . . .
 "Q. Would that be where the terminus, the end of the pipe would have been?
 "A. Actually the concrete pipe temporarily stopped at that point in 1979.
". . . .
 "A. Thirty-inch diameter pipe was put in in '79, right.
 "Q. And this was prior to the development of Plat Four?
"A. Right.
". . . .
 "Q. So in 1979, whatever water was coming through the system was being dispersed through a 30-inch pipe approximately a hundred fifty feet from the property line of the then-Bill Watts property?
 "A. Right. But it also joined the old ditch that was carrying all the other water. So it's not like the 30-inch pipe was increased — the quantity was increased to a 78-inch pipe, because other water existed. It was already there coming through a ditch instead of through a pipe.
". . . .
 "A. . . . [The] quantity of the water was the same.
 "Q. But the construction of streets and the paving of driveways and the development of this subdivision did increase the runoff?
 "A. So we are talking about how much percentage of pavement or increase did the development in Plat Four create? And I haven't done any calculations on it, but I would get it down to maybe less than a percent in reality.
". . . .
 "Q. Do you have a judgment as to the difference in the velocity and concentration — and this may not be a very well-put question — but between the terminus in 1979 and what's there now?
 "A. I think you ought to look at what crossed the property line in 1979 and what crossed the property line in 1984.
"Q. Okay.
 "A. You know, that's what goes onto [the Robichauxs'] property. And if you look at that, you'll find a very, very small difference.
". . . .
 "A. Concentration . . . would be insignificant. You've got a pipe that's — one where you had a ditch and this is where you've got a pipe. So the effect really is not that much difference, really as far as what happens.
". . . .
 "Q. All right. Did y'all do or did anybody do any studies at any point in time as to the volume of water that would go into the system?
 "A. Yes. It's on the chart. It's all spelled out. You know, in 1979. . . .
". . . .
 " Q. And George, if I understand your testimony right, you don't believe any more water is going onto Dr. Robichaux's property now than was going on it in 1979?
 "A. No, I didn't say that. I said that there's a very small percentage.
"Q. More?
 "A. More, right. But there would be some increase, right. And it's not to mislead — When you talk about a 30-inch pipe in '79, you talk about a [78]-inch pipe in 1984, that's misleading, because the 30-inch pipe is only one part of the system. In '79, you had a 30-inch pipe *Page 1021 
plus an open ditch. And when those two came together, they gave you almost the same quantity of water as the pipe did in 1984. That pipe replaced the ditch, because there was a ditch going through the property.
". . . .
 "A. The size Plat Four has added is very small compared to the overall area of the concentration of water. It had very little effect on the amount of water.
". . . .
 "Q. George, the terminus shown on the easement is the same terminus as was shown in Plat Four submitted to the City; is that correct? In other words, the terminus in the easement shows a hundred sixty feet from the —
"A. Right.
"Q. — from the southeast corner of Plat Four?
"A. Right.
 "Q. And that's the same description as is contained in the easement which was obtained from Watts in 1979?
"A. Right.
 "Q. And the plans approved by the City in 1979 included the calculations of the water flow from Plat Four which is now in place?
"A. That's right."
In this case, the purpose of the easement is clear and undisputed — the right to drain surface water from the subdivision onto the Robichauxs' property. For this right, AFBIC paid $14,000. The easement does not specify or restrict the amount of surface water that could be drained across the property. Upon completion of the subdivision, AFBIC tied in its drainage system to drain the surface water from phases three and four through a pipe inside the existing natural ditch. The terminus point is currently located at the point stated in the easement. The discharge of water from the subdivision onto the Robichauxs' property has always been accomplished at the terminus point specified in the easement, albeit at one time through a natural ditch rather than through a pipe. AFBIC has only done that which is reasonably necessary to effectuate the purpose of the easement in this case. See Ellard v. Goodall,203 Ala. 476, 83 So. 568 (1919); see also Alonzo v. Sanford, supra. AFBIC established that it has not misused the easement so as to unlawfully interfere with the flow of water onto the Robichauxs' property. Without an unlawful interference with the Robichauxs' property, no cause of action can be maintained under the theories of trespass and/or nuisance.
We have examined the evidence that the Robichauxs introduced in an attempt to present substantial evidence of unlawful interference with their property by AFBIC. Viewing the evidence in the light most favorable to the Robichauxs, however, in view of the rights obtained by AFBIC by virtue of the easement, we do not find substantial evidence that AFBIC unlawfully interfered with the Robichaux property.
Therefore, we hold that the trial court did not err in entering summary judgment for AFBIC.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., concur.