These parties have previously been before this court. See City ofDothan v. Eighty-Four West, Inc., 738 So.2d 903 (Ala.Civ.App. 1999) ("Dothan I"), for a detailed factual and procedural history.
The plaintiff City of Dothan ("the City") and the defendant Spann Farm Partnership, Ltd. ("Spann Farm"), appeal from a judgment entered in favor of the defendants Eighty-Four West, Inc., and Quin E. Flowers, Jr., ("the Flowers Defendants"), in a declaratory action commenced by the City to construe an instrument creating an easement. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala. Code 1975.
The facts established by this court in Dothan I are necessary to an understanding of the issues presented by this appeal; therefore, we will state the facts from Dothan I:
 "The property involved in this appeal is located in the City of Dothan and consists of about 400 acres that once belonged to the Couch Sand Company. This property was later acquired by Quin E. Flowers, Jr. (`Flowers'); his sister, Juleann Flowers Torrence; and *Page 1229 
 her husband, Samuel M. Torrence (the `Torrences'), as tenants-in-common. In 1990, Flowers sued the Torrences for a sale of the 400-acre tract of real estate and a division of the proceeds. That lawsuit was settled, and as part of the settlement agreement Flowers and the Torrences agreed to a division of this land. The division agreement called for Flowers to take ownership of an eastern parcel and for the Torrences to take ownership of a western parcel, each of which consisted of about 200 acres.
 "As part of the settlement agreement, in May 1991 the Torrences conveyed to Flowers a 100-foot-wide easement across their Spann Farm development. The `extent and purpose of [this] easement is to allow for the drainage of surface water from Flowers's property whereby such surface water will be allowed to follow the natural drainage channel on [the] Torrences' property. . . .'[*] The settlement also called for Flowers to convey to the Torrences a sanitary-sewer easement across a portion of his property. Both the 100-foot surface-water-drainage easement and the sanitary-sewer easement were duly recorded in the Houston County Probate Office. It is undisputed that the parties have had several developmental studies prepared that considered how the land in question might be used in the future, including the possibility that it would be developed as a residential subdivision.
 "It is also undisputed that at least two of these studies, including one conducted just before the parties divided the original 400-acre tract, contemplated the effect surface-water drainage would have on the development of the 400-acre tract. Because these studies are not in the record we are unable to determine what conclusions these studies reached.
 "Sometime before July 29, 1993, Spann Farm completed development of Spann Farm Subdivision. Flowers began development of his eastern parcel in 1995 by forming Eighty-Four West, Inc. (collectively, Flowers and the corporation will be called the `Flowers Defendants'), and conveying approximately 107 acres of his 200 acres to it. The 107 acres became known as Grove Park Subdivision. Flowers retained personal ownership of the remaining 93 acres of the eastern parcel and of the drainage easement. The 93-acre parcel lies to the east of Grove Park Subdivision, which lies to the east of Spann Farm Subdivision. The surface-water drainage easement runs from the southwest corner of the Grove Park Subdivision onto Spann Farm Subdivision.
 "Sometime before April 1997, Flowers submitted a certain plat and plans for Grove Park Subdivision to the City of Dothan Planning Commission. These plans provided for the construction of roads, storm sewers, a water system, and a sewage system. In April 1997, the Planning Commission approved these plans and the Flowers Defendants began construction in Grove Park.
 "On or about August 20, 1997, Flowers applied for a grading permit to build an earthen dam on the 93-acre parcel that he personally owns, to prevent surface water from the lands owned and occupied by the Sony Magnetic Products plant and an electrical substation owned by the City, adjoining and to the east of Flowers's property, from flowing onto that property and the Grove Park Subdivision and damaging it. . . .
 "Also on or about August 20, 1997, the Flowers Defendants submitted an additional plat and plans for Grove Park Subdivision to the Planning Commission.
 "The nature of the documents that the Flowers Defendants submitted to the *Page 1230 
 Planning Commission is disputed. The Flowers Defendants assert in their brief to this court that they submitted the preliminary plat and plans for Grove Park Subdivision Phases I, II, and III to the Planning Commission in April 1997, and that the City approved these plans. The Flowers Defendants further aver that the second set of documents they filed with the Planning Commission were construction plans `for all phases of the subdivision development.' However, Flowers avers in his first affidavit that he submitted `the subdivision plat and plans for Grove Park Subdivision Phase I' to the Planning Commission in April 1997, and that he `applied for approval of the plat and plans for Grove Park Subdivision Phases II and III' after the plans for Phase I were approved. The City's complaint alleges that it approved the `construction plans' for Grove Park Subdivision Phase I in April 1997 and that the Flowers Defendants then submitted a request for approval of `construction plans' for Grove Park Subdivision Phases II and III. The respective plats and plans also were not put into evidence and they are not in the record.
 "The disposition of the August 20, 1997, plat and plans is also unclear. The City argues in its brief to this court that it had conditioned the approval of the plat and plans `upon Flowers's completion of design of a surface water management system pursuant to local ordinance.' The City claims that Flowers refused to design such a system because the May 1991 surface-water-drainage easement does not limit the volume of water that flows through it and, thus, eliminates the need for Flowers to design such a system. The Flowers Defendants argue that they have submitted construction plans to the city engineer for his approval and that the construction plans include a storm-water-management system.
 "The City did not approve the August 20, 1997, plat, plans, and grading permit. Rather, on August 28, 1997, it filed a complaint for a declaratory judgment, against Eighty-Four West, Inc., and Spann Farm Partnership, Ltd., seeking clarification as to (1) the volume of surface-water runoff that is allowed to pass through the May 1991 easement across the property owned by Spann Farm, and (2) whether the City was required to grant Flowers's application for a grading permit that would allow Flowers to construct an earthen dam on his 93-acre parcel to prevent surface-water runoff from higher landowners from coming onto and damaging his two parcels of land.
 The City alleged that a ruling regarding the volume of surface-water runoff allowed to flow through the May 1991 drainage easement `is necessary for review of the design and approval of the storm water management system for the development of Phases II and III of Grove Park Subdivision.'
 "The City later amended its complaint, requesting a declaration of the parties' respective rights in a 50-foot sewer and utility easement that belonged to the City and that was located in the area where Flowers's earth work was proposed.
 "Eighty-Four West, Inc., moved to join Flowers as a defendant to this action under Rule 19, Ala.R.Civ.P., and the court granted this motion. The Flowers Defendants answered by raising various legal defenses and by asserting that the May 1991 easement is clear, unambiguous, and not subject to construction. The Flowers Defendants further asserted that the `common enemy' rule of law entitled them to build the earthen retaining wall or dam to prevent surface-water runoff from coming onto *Page 1231 
 and damaging Flowers's 93-acre parcel and the Grove Park property. The Flowers Defendants denied that the proposed dam would unlawfully or unreasonably interfere with the City's 50-foot sewer and utility easement.
 "[*]The May 1991 surface-water-drainage easement is not included in the record of this case. However, the City of Dothan alleged the existence and purpose of this easement in its complaint, and Spann Farm and Flowers admitted the existence of the easement. A fact admitted in the pleadings need not be proven by another party. See Kennamore v. State, 686 So.2d 295, 296 (Ala.Civ.App. 1996). Moreover, the agreement as to division of certain real property, which is included in the record, states the terms and purpose of the easement."
Dothan I, 738 So.2d at 904-06.
On January 14, 1998, the Flowers Defendants moved the court for a summary judgment; the City responded to that motion. On March 16, 1998, Spann Farm, the owner of the development downstream from the Grove Park development, answered the City's complaint and responded to the Flowers Defendants' summary-judgment motion.
Following a hearing on the Flowers Defendants' motion for summary judgment, the trial court entered an order on April 10, 1998, granting the motion and holding that the clear and unambiguous language of the May 1991 drainage easement does not limit or restrict the permissible volume or speed of the water allowed to drain through the easement; that the easement was intended to, and was sufficient to, permit the drainage of water coming onto or falling onto the land owned by the Flowers Defendants to drain through the land owned by the Torrences; ordering the City to grant final approval of the Flowers Defendants' plans for phases II and III of the Grove Park Subdivision; and finding that the water at issue is "surface water" and that Flowers has an absolute right to construct a dam or retaining wall to protect his land from oncoming surface water; and ordering the City to grant the permit to construct the dam. Id.
This court identified the existence of two controversies on appeal: (1) the amount of water allowed to flow through the May 1991 drainage easement, and (2) whether the City was required to give Flowers a grading permit to construct a retaining wall on the 93-acre parcel of land that he personally owns. This court held:
 "Concerning the May 1991 drainage easement, we think the written easement is clear and unambiguous. The trial court was required to construe its terms according to their clear language. Robichaux v. AFBIC Development Co., 551 So.2d 1017 (Ala. 1989); Cobb v. Allen, 460 So.2d 1261 (Ala. 1984). The trial court correctly held that `any and all surface water coming onto or falling onto' the Flowers Defendants' land should be allowed to drain through this easement onto the property of the Torrences.
 "The May 1991 easement also is limited by its plain language to the drainage of surface water, as opposed to water from a defined or an intermittent stream. The only evidence presented by the Flowers Defendants is the affidavits submitted by Quin E. Flowers, Jr., and the exhibits attached thereto. Neither the affidavits nor the exhibits contain any evidence tending to prove that the water at issue is surface water. Because the Flowers Defendants did not eliminate all issues of material fact, the trial court erred in entering in their favor a summary judgment regarding the May 1991 easement. Ray v. Montgomery, [399 So.2d 230 (Ala. 1980)]; Ufford v. American Indemnity Co., 631 So.2d 959, 962 (Ala. 1994). *Page 1232 
 "The trial court also erroneously entered a summary judgment in favor of the Flowers Defendants concerning the grading permit and the earthen dam that Quin E. Flowers, Jr., proposed to construct on the 93-acre parcel he personally owns. To be entitled to a summary judgment, the Flowers Defendants had to show that the water to be diverted by the proposed earthen dam is not a stream, but rather is surface water. Drummond v. Franck, 252 Ala. 474, 41 So.2d 268 (1949); Winter v. Cain, 279 Ala. 481, 187 So.2d 237 (1966); Dekle v. Vann, 279 Ala. 153, 156, 182 So.2d 885, 887 (1966); Burson v. Saliba, 270 Ala. 212, 116 So.2d 609 (1960). Because the Flowers Defendants presented no evidence concerning this issue, the trial court erred in entering a summary judgment in their favor."
Dothan I, 738 So.2d at 909-10.
Upon remand, the parties conducted discovery and the matter was scheduled for trial on April 20, 2000. On that date, the Flowers Defendants moved the court to view the property in question. The court granted the motion and viewed the property. Thereafter, the trial court conducted ore tenus proceedings, on April 20, 2000, May 11, 2000, and August 9, 2000. Following the ore tenus proceedings, the court, on August 17, 2000, entered an order finding that the water involved was surface water and that the Flowers Defendants have an absolute right to construct a dam or wall on their property pursuant to the "common-enemy" rule, to repel oncoming surface water; ordering the City to grant the grading permit requested by Flowers; and ordering the City to grant final approval of the Flowers Defendants' plans for phases II and III of the Grove Park subdivision. The City appealed; Spann Farm appealed following the denial of its postjudgment motion. The case is before this court pursuant to § 12-2-7, Ala. Code 1975.
The City argues that the trial court erred in applying the common-enemy rule and determining that the Flowers Defendants are entitled to construct a dam, because, it says, the construction of the dam will result in the flooding of upstream properties, including a city electrical substation, a federal highway, and a hospital. Our supreme court has explained the "common-enemy" rule as follows:
 "As to lands outside a municipality, our decisions have adopted the civil law rule, that is the inferior heritage or lower surface is doomed by nature to bear a servitude to the superior in that it must receive the water that falls on and flows from the higher land. This is a natural easement created by law and imposed upon the owner of the lower surface.
 "However, an exception to the civil law rule prevailing as to rural lands was recognized early in our jurisprudence, and has been consistently adhered to. This exception to the civil law rule, supra, is that as to city, town, or village lots, the common law or `common enemy' rule should govern. Such rule entitles the owner of urban property to fight off surface water as a common enemy, and in doing so he may build walls, or dams to prevent the water flowing onto his heritage. As stated in Burson v. Saliba, 270 Ala. 212, 116 So.2d 609:
 "`The result of our decisions is that the lower proprietor in an incorporated town or city can build a wall or other obstruction on his property extending to the line between it and higher property and thereby prevent water from passing from the higher property over his property, although that is the only way in which the surface water can pass. This is so *Page 1233 
 simply because the area happens to be incorporated in a town or city.'"
Dekle v. Vann, 279 Ala. 153, 156, 182 So.2d 885, 888 (1966) (citations omitted). Crucial to the court's application of the "common-enemy" rule is its determination that the water involved is surface water and not an intermittent stream. In determining whether water is surface water or a stream, the court looks to two factors: (1) whether the water is channeled in well-defined banks, and (2) the source of the water. SeeBarber Pure Milk Co. v. Young, 38 Ala. App. 13, 81 So.2d 324 (1954).
The standard of review in a declaratory-judgment case when the court has received ore tenus evidence has been stated as follows:
 "`Under the "ore tenus rule," a presumption of correctness accompanies the trial court's judgment when it has made findings of fact based on disputed oral testimony without a jury, and its judgment will not be reversed unless it is shown to be plainly and palpably wrong, considering all of the evidence and all inferences that can be logically drawn from the evidence. This presumption [is] coupled with the wide discretion vested in the trial judge in declaratory judgment actions.'"
Concerned Citizens of Fairfield v. City of Fairfield, 718 So.2d 1140,1141 (Ala.Civ.App. 1998), quoting Alabama Highway Dep't v. Stuckey's/DQof Grand Bay, Inc., 613 So.2d 333, 335 (Ala. 1993) (citations omitted).
The City's expert witness, Dr. Rocky Durrans, testified that the watercourse in question was an intermittent stream. Dr. Durrans stated that he based his conclusion on the fact that the watercourse lacks vegetation and contains some alluvial soils,[1] which indicate that water has been draining through the area on a regular basis for a long time. On cross-examination, Dr. Durrans testified that the watercourse was fed entirely by rainwater. He stated that an intermittent stream did not necessarily have to be fed by groundwater and that he did not look for groundwater as the source of the alleged intermittent stream. Dr. Durrans also testified that he viewed the area with the court and that the area that he concluded was an intermittent stream was completely dry at that time.
Gary Martin, the Dothan city engineer, testified that the watercourse was an intermittent stream and that the construction of the proposed dam by Flowers would result in the flooding of upstream properties, including the City's electrical substation and U.S. Highway 84. On cross-examination Martin stated that the watercourse is not supplied by groundwater and contains only rainwater or surface water.
The Flowers Defendants' expert, Dr. Steven Jenkins, testified that he had viewed the area on several occasions and had concluded that the water at issue was surface water. He stated that an intermittent stream by definition is a stream that at least some of the time is fed by groundwater and that he saw no indication of a headwater, which is an outcropping of the groundwater that would feed the stream. Dr. Stevens stated that the watercourse would contain water only after a storm, when rainwater was running off the property. Dr. Stevens also testified that he considered the watercourse to be a man-made ditch and not a naturally occurring stream or creek.
William C. Douty, the engineer who designed the Grove Park subdivision for Flowers, testified that the source of the *Page 1234 
water for the watercourse was rainfall and that in his opinion that was surface water. Douty referred to the area as a "farm ditch." Douty further testified that the water-detention facilities located on the upstream properties of Flowers Hospital and the Sony Magnetic Products plant are insufficient to control the storm-water runoff onto the Flowers Defendants' property. Douty testified that the construction of the dam would cause the upstream properties, including the Sony plant and the City's electrical substation, to flood. However, he also testified that the construction of the dam would prevent the Chapelwood subdivision, which is located downstream from the Grove Park subdivision and frequently floods, from flooding. Douty further testified that he drew the plans for the proposed dam, but would not endorse them because he did not feel that the dam was the best storm-water management practice for the area and that he could lose his professional license if any flood damage resulted from the construction of the dam.
Terry Macaluso, Douty's supervisor, testified that he was familiar with the area in question and that no stream or creek ran through the area. Macaluso stated that the plans for the subdivision originally submitted to the City did not include a dam and that in his opinion the construction of the dam would cause flooding to the upstream properties, including U.S. Highway 84, the City's electrical substation, and Flowers Hospital.
We note that a map prepared by the United States Geographical Service indicates the presence of a stream; however, a map maintained by the City does not indicate the presence of an "intermittent stream."
The trial court heard disputed evidence as to whether the water involved was surface water or was an intermittent stream. The court also visited the property in question. After carefully reviewing the record evidence as to this issue, we cannot say the trial court abused its discretion in determining that the water involved is surface water and holding that Flowers is entitled to construct a dam on his property to fend off oncoming surface water, pursuant to the "common-enemy" rule.Dekle, supra. Accordingly, the trial court's judgment as to this issue is affirmed.
Both the City and Spann Farm argue that the trial court erred in ordering the City to give final approval to phases II and III of the Grove Park subdivision. The City contends that the existence of the May 1991 easement does not exempt the Flowers Defendants from having to comply with the City's subdivision storm-water design policies and requirements. Spann Farm contends that the existence of the May 1991 easement does not supersede the City's police power to approve or disapprove subdivision development plans.
The evidence indicates that for approximately the past 10 to 15 years, the City's policy with regard to storm-water management systems had been that developers must limit the post-development runoff levels to that of pre-development levels. Douty was informed of the policy by letter on December 13, 1996. The policy was adopted as a City ordinance on April 6, 1998. It is the basic position of the Flowers Defendants that the May 1991 easement and the construction of the dam constitute a sufficient storm-water management system for the development and that the plans for phases II and III should be given final approval by the City.
Douty testified that the plans for phases II and III of the subdivision were complete when submitted to the City for approval, except for completion of a sanitary lift station and the construction of a ditch *Page 1235 
on the southern part of the property. Douty stated that the plans included a sufficient storm-water management system for the subdivision itself. On cross-examination, Douty testified that the original plans for the subdivision called for the construction of detention ponds in order to control the storm-water runoff; however, he said he was instructed by Flowers to remove the detention ponds from the plans because of the existing easement and for economic reasons. Douty testified that he had designed the subdivision with detention ponds because it had been his experience that the City would require detention ponds in the subdivision.
Douty testified that the post-development runoff levels created by the subdivision will exceed the pre-development runoff levels by three times and that the downstream effect on other properties had not been studied. Douty testified as follows:
 "Q. And you think, in your expertise, that it would be a good thing for you to study the downstream effect before you submitted plans to the City of Dothan; is that correct?
 "A. My opinion is the storm-water management from the drainage system hasn't been studied by an engineer because the engineering community doesn't know what solution the legal community is going to accept.
". . . .
 "Q. So what you said was, we need to study upstream of Grove Park and the downstream effect. We need to study the entire basin in order for us to know how to engineer this subdivision; correct?
"A. To manage the storm water in the basin.
". . . .
 "Q. You don't feel comfortable telling anybody to accept any set of plans without us knowing more than we know right now, do you?
"A. We said so on these drawings.
". . . .
 "Q. You are not ready to make a recommendation about how this storm water should be managed because you don't have the data yet; isn't that true?
 "A. My advice to Mr. Flowers all along was to get this solved from a legal standpoint, then the engineer, whoever they are, can design something that's acceptable.
"Q. And that would be why you don't have the data?
"A. That's correct.
". . . .
 "Q. You are not ready to go to the City and make a recommendation, are you?
"A. No, I'm not."
Macaluso testified that the plans for the storm-water management system for the subdivision were complete if you assumed that Flowers had the right to build his proposed dam and that all the water falling onto or coming onto the Flowers Defendants' land could drain through the May 1991 easement. Macaluso stated that if all the surface water from the Grove Park subdivision could drain through the easement, then the subdivision would not need any detainage. He further testified that the May 1991 easement could be an exception to the City's requirement that post-development runoff levels equal pre-development runoff levels.
On cross-examination, Macaluso testified that the plans for the Grove Park subdivision originally called for detainage, because the City typically required developers to use detainage in their developments. Macaluso stated that the detainage was removed from the plans at Flowers's request *Page 1236 
because of economic reasons. Macaluso also testified that the City's requirement that post-development runoff equal pre-development runoff is a standard requirement in the development industry. Macaluso also testified that Flowers represented to him that he had obtained legal advice with regard to the easement and was informed that the existence of the easement abrogated the City's normal police power to regulate the flow of storm water in the subdivision. Macaluso agreed with the testimony of Douty and stated that post-development runoff levels created by the subdivision would exceed those of pre-development levels. Finally, Macaluso testified that he could not state whether the storm-water runoff would stay within the bounds of the easement, without surveying it.
Martin testified that the construction plans for the subdivision are not in compliance with the City's requirement that post-development runoff levels equal pre-development levels and that the plans are incomplete, because they do not provide for the conveyance of preexisting storm water. Martin conceded that his opinion was made without consideration of the common-enemy rule.
Martin testified that if phases II and III of the subdivision were constructed as proposed by the Flowers Defendants, then the construction would
 "result in severe overtaxing of downstream facilities resulting in flood damage to downstream property owners at a greater frequency and with less rainfall than if the design were to meet the storm-water runoff control and management requirements established by the City Engineer to provide proper regard for the safety, health and welfare of the public."
At trial, the Flowers Defendants sought to introduce evidence as to the adequacy of the storm-water management system proposed for the subdivision. Counsel for Spann Farm made the following objection:
 "I object to any testimony in this case about plans to the Grove Park subdivision as if you were somehow being called upon to approve or disapprove those plans. As I've stated before and will state again, this is a declaratory-judgment action to determine two issues: What does the easement mean on the lower side of the property and what is the status of the upper side of the property vis-a-vis the common-enemy rule.
 "You are not sitting as a glorified board of zoning adjustment to approve or disapprove the actions of the Engineering Department, to approve or disapprove the actions of the Planning Commission.
 "This court is not empowered, under the law, to sit in judgment of how this City Engineer engineers or requires people like Bill Douty to engineer subdivisions. That is not an issue in this case."
We agree with this characterization of the case. The legislature has given the City the authority to regulate the development of subdivisions through its planning commission. § 11-52-31, Ala. Code 1975. "Subdivision legislation is part of planning legislation, as is zoning; they are all predicated on the police power of the state." City ofMobile v. Waldon, 429 So.2d 945, 947 (Ala. 1983).
As stated above, this court in Dothan I identified the existence of two controversies: (1) the volume of water allowed to pass through the May 1991 easement, and (2) whether the City was required to give Flowers a permit to construct a dam on his property. We specifically noted in footnote 2 of that opinion that the issue whether the plans for the subdivision provide an adequate storm-water management system *Page 1237 
was not before this court. Dothan I, 738 So.2d at 909. In deciding the issue as to the volume of water allowed to pass through the easement, we held that the trial court correctly determined that "`any and all surface water coming onto or falling onto' the Flowers Defendants' land should be allowed to drain through the easement onto the property of the Torrences." Id., at 909-910. Today, we have affirmed the trial court's determination that the City is required to grant Flowers the permit to construct the dam on his property. We have held that the water involved is surface water and that, pursuant to the "common-enemy" rule, Flowers is entitled to construct the dam on his property in order to repel oncoming surface water.
Simply because this court has affirmed the trial court's determination that any and all surface water should be allowed to drain through the easement and that Flowers is entitled to construct the dam on his property, there is no determination that the proposed plans for the subdivision's storm-water management system are adequate. We note the testimony of the two design engineers hired by the Flowers Defendants. Douty testified that the effects of runoff from the subdivision on downstream properties was unknown and that he needed more data before he could make a recommendation on the storm-water management system. Macaluso testified that the plans for the subdivision were complete; however, his opinion was based on the assumption that all the storm water could drain through the easement. He later testified that he could not state whether the storm water would even stay within the bounds of the easement, without the easement's being surveyed.
It is for the City and its planning commission to consider the holding of this court and then to exercise the authority delegated to it by the legislature, based on its police power, and to determine whether the proposed storm-water management system is adequate. Accordingly, we must reverse the judgment of the trial court insofar as it orders the City to grant final approval of the plans for phases II and III of the Grove Park subdivision.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Crawley and Pittman, JJ., concur.
Thompson and Murdock, JJ., concur in the result.
[1] Alluvial soils are soils that are transported by water.