Edward BUSSE, and Hovde Development Corp., a general partnership known as River Ridge Joint Venture, Plaintiffs-Appellants,†

v.

CITY OF MADISON, a Municipal Corporation, Common Council for the City of Madison, a Municipal Corporation, George E. Austin, Secretary of the Madison Plan Commission, and Andre Blum, Madison City Clerk, Defendants-Respondents.

Court of Appeals

*No. 92–0038. Oral argument October 29, 1992.—Decided June 17, 1993.*

(Also reported in 503 N.W.2d 340.)

†Petition to review pending.

808

For the plaintiffs-appellants the cause was submitted on the briefs of *Bruce K. Kaufmann* of *Jenswold, Studt, Hanson, Clark & Kaufmann* of Madison and orally argued by *Bruce K. Kaufmann.*

For the defendants-respondents the cause was submitted on the brief of *Eunice Gibson*, city attorney, and *James M. Voss*, assistant city attorney, of Madison and orally argued by *James M. Voss.*

Brief of amicus curiae was submitted on behalf of the Madison Audubon Society, Inc. by *Kristine A. Euclide* and *Thomas G. Wilson* of *Stafford, Rosenbaum, Rieser & Hansen* of Madison.

Before Gartzke, P.J., Dykman and Sundby, JJ.

DYKMAN, J. This is an appeal from an order affirming the City of Madison Common Council's rejection of the "River Ridge Run" revised preliminary plat. Because we conclude that the council's rejection was not arbitrary, unreasonable or discriminatory, we affirm.

## BACKGROUND

River Ridge Joint Venture, a general partnership, purchased 198 acres of land from the Adult Christian Education Foundation, Inc. for the purpose of subdividing the land to provide residential building sites.[1] The land straddles the boundary between the City of Madison and the Town of Westport, with 111 acres in

---

[1] A city report shows that the owner of the land is the foundation and that the partnership is a "contract owner."

the city and eighty-seven acres in the town. An initial preliminary plat placed some of the project's streets and lots in the city, but the revised plat placed all lots and streets in the town. Southeast of the plat is the Yahara River, and between the river and the plat are wetlands. The area is known as the Cherokee Marsh, though none of the plat is in the marsh.

River Ridge obtained conditional approval of its plat from the town and from Dane County. It discussed the project with City of Madison planning and development staff, and ultimately submitted a revised preliminary plat to the city plan commission. On February 1, 1990, the city staff planning unit report recommended rejection of the plat. The city plan commission held hearings on December 4, 1989, and February 5, 1990, where much testimony was heard, most of which was adverse to River Ridge. The plan commission recommended that the city council reject the revised preliminary plat. The common council rejected the plat, giving eleven reasons for doing so. River Ridge appealed to the circuit court, which affirmed the common council. River Ridge appeals.

## STANDARD OF REVIEW

A person aggrieved by a municipality's failure to approve a plat may appeal to the circuit court pursuant to sec. 236.13(5), Stats., which incorporates the review procedure of sec. 62.23(7)(e) 10, 14 and 15, Stats. This procedure is known as "statutory certiorari," and may include additional evidence being offered to the court. But where, as here, no additional evidence is taken, the circuit court and this court review the common council's decision under traditional standards of common law certiorari. *State ex rel. Brookside Poultry Farms,*

811

*Inc. v. Jefferson County Bd. of Adjustment*, 131 Wis. 2d 101, 122, 388 N.W.2d 593, 601 (1986). Those standards, codified in sec. 236.13(5), are whether the action of the approving authority (here, the common council) was arbitrary, unreasonable or discriminatory. The test is whether the decision of the common council is adequately supported by evidence in the record. *Brookside*, 131 Wis. 2d at 122, 388 N.W.2d at 601.

## DECISION

In its brief, River Ridge asserts that the City of Madison Common Council did not have authority to reject its preliminary plat.[2] It contends that a city's only response to a preliminary plat is conditional approval. But at oral argument, River Ridge agreed that a city could reject a preliminary plat if the land were unsuitable for development. We reject the notion that a city must approve all preliminary plats, if only conditionally. Section 236.11(1)(a), Stats., provides: "Within 90 days [of submission] the approving authority . . . shall take action to approve, approve conditionally, *or reject* the preliminary plat and shall state in writing any conditions of approval or reasons for rejection . . . ." (Emphasis added.) The plain meaning of sec. 236.11(1)(a) makes River Ridge's assertion untenable. A city may reject a preliminary plat.[3]

---

[2] Section 236.02(9), Stats., defines a preliminary plat as "a map showing the salient features of a proposed subdivision submitted to an approving authority for purposes of preliminary consideration."

[3] River Ridge cites *Cherry Valley Assocs. v. Stroud Township Bd. of Supervisors*, 554 A.2d 149 (Pa. Commw. Ct. 1989), as authority for its assertion. But the ordinance in *Cherry Valley* did not permit a rejection of a preliminary plat as does sec.

■

We also conclude that we need not address all eleven reasons the city gave for its rejection of River Ridge's preliminary plat. If one of the city's reasons for rejecting the plat is adequate, whether the other reasons are valid is irrelevant. We will therefore examine a reason given by the city that falls within River Ridge's concession that a city may reject a preliminary plat if the land is unsuitable for development.

Section 16.23(3)(a)3 of the Madison, Wis., General Ordinances provides:

> No land shall be subdivided which is held by the City Plan Commission to be unsuitable for use by reason of flooding, bad drainage, soil or rock formations with severe limitations for development, severe erosion potential, or unfavorable topography, or any other feature likely to be harmful to health, safety or welfare of future residents or landowners in the proposed subdivision or of the community.
>
> The City Plan Commission in applying the provisions of this section shall in writing recite the particular facts upon which it bases its conclusion that the land is not suitable for the proposed use, after affording the subdivider an opportunity to present evidence regarding such suitability at a public hearing.

The common council's resolution rejecting River Ridge's revised preliminary plat reads in pertinent part:[4]

---

236.11, Stats. Thus, the Pennsylvania court's conclusion is not persuasive as to River Ridge's plat.

[4] The common council's findings regarding the four categories of reasons why the plan commission recommended rejection

WHEREAS, the Madison Plan Commission determined that the land proposed to be subdivided is unsuitable for development as set forth in Section 16.23(3)(a)3.; and

The Plan Commission is not satisfied that adequate measures have been taken to ensure protection of the health, safety, and general welfare of the community from the combined impacts of the following factors:

Urban runoff contaminated with lawn chemicals, road salt, and other urban pollutants in an area underlain by fractured bedrock may affect the quality of groundwater feeding Cherokee Marsh and nearby wells.

Either shallow or deep wells to serve the proposed subdivision will alter the level and flow of groundwater which may affect the flow of springs and seepages into Cherokee Marsh.

Erodible soils, urban pollutants, construction site runoff, increased overall runoff, and inadequate erosion control and stormwater detention measures may result in the deposit of silt and pollutants in wetlands and the Yahara River downstream from the proposed subdivision.

The above-mentioned factors together with the overall loss of wildlife habitat due to the proposed subdivision will adversely affect the flora and fauna of Cherokee Marsh and may reduce and endanger the population of some important species.

Madison, Wis., Resolution No. 46,432 (Feb. 20, 1990).

We now examine the objections River Ridge has to these findings.

---

of the plat were adopted verbatim from the written minutes of the plan commission's meeting of February 5, 1990.

River Ridge cites a comment from the Madison superintendent of parks that "[i]t appears that the developer can also meet the conditions re: stormwater detention and deed restrictions to minimize visual impact," and his recommendation that if the plat is approved, it should meet the City of Madison's standards for stormwater detention and erosion control.

The common council is not required to accept the recommendations of its parks superintendent. In any event, the question is not whether this project meets general standards of stormwater detention and erosion control, but whether under Madison, Wis., Gen. Ordinances § 16.23(3)(a)3, there are particular features of this plat which make it unsuitable for development.

River Ridge argues that there is no evidence in the record which shows that the plat's two proposed wells would alter the level or flow of groundwater. But River Ridge cites no authority that requires the city to prove that groundwater *would* be affected. Under certiorari review, we inquire only whether the city's reasons are arbitrary, unreasonable or discriminatory. The plan commission and the common council heard evidence that the Wisconsin Department of Natural Resources had recommended that a hydrological study of the Cherokee Marsh be done. Pamela Porter, the Executive Secretary of the Madison Audubon Society, opined that the proposed subdivision would probably adversely alter the quantity and rate of water entering Cherokee Marsh, which she and many others described as a Priority Group I wetland, a rating reserved for wetlands that "contain many or all virgin traits and unique biological features."

We recognize that River Ridge produced conflicting opinions. But that is not the test. The common council was not obliged to accept those opinions. We

conclude that it is not arbitrary, unreasonable or discriminatory to accept opinions that a plat would probably adversely affect groundwater which feeds an important wetland.

River Ridge contends that there is no evidence in the record showing that loss of wildlife habitat would affect the flora and fauna of Cherokee Marsh and reduce and endanger the population of some important species. This is not correct. The record contains a letter from Donald M. Waller, a botany professor at the University of Wisconsin-Madison. He notes that housing developments around the Cherokee Marsh would result in less habitat for animals that now live around the marsh. He believes that the marsh needs an "expanded buffer zone" to prevent its sensitive plant and animal species from being disrupted. He writes that recent research in conservation biology shows a "need to reduce habitat disruption and fragmentation if sensitive wildlife species are to be preserved." According to a spokesperson for the Yahara Basin Neighborhood Association, River Ridge's land harbors wild turkeys, sandhill cranes, deer, opossum, foxes, mink, weasels and woodchucks. The Madison Audubon Society noted a long list of birds that use the Cherokee Marsh, and its executive secretary opined that "future development of the uplands of the marsh is inversely proportional to the health of the Cherokee Marsh [w]etland ecosystem."

But River Ridge also argues that the City of Madison Cherokee Marsh Revised Long Range Open Space Plan (Cherokee Marsh Plan) boundary was drawn to protect the lowlands and preserve natural vegetation and wildlife habitat, and a compromise with city staff as to the location of the boundary line

removes the plat from within the Cherokee Marsh Plan.

The concerns addressed by the Cherokee Marsh Plan are partially, but by no means entirely, the same concerns identified in the city's rejection of the plat under Madison, Wis., Gen. Ordinances § 16.23(3)(a)3. The area encompassed by the Cherokee Marsh Plan is almost entirely located within the city, at least in the vicinity of River Ridge's plat. The plat is located adjacent to, but at a generally higher elevation than, the area covered by the Cherokee Marsh Plan. Thus, whether or not River Ridge has satisfied city staff that the plat does not compromise the Cherokee Marsh Plan is not relevant to its sec. 16.23(3)(a)3 rejection. And, as we have noted, the common council is not bound by opinions, compromises or recommendations of its staff.

River Ridge's reply brief states: "No part of [Madison, Wis., Gen. Ordinances § 16.23(3)(a)3] provides the specificity of notice requirement necessary to fulfill administrative responsibility under the law." It cites two cases in support of this contention, *Goodman v. Board of Comm'rs of S. Whitehall*, 411 A.2d 838, 841 (Pa. Commw. Ct. 1980), and *Carlson v. Town of Beaux Arts Village*, 704 P.2d 663, 665 (Wash. Ct. App. 1985).

*Goodman* noted that a Pennsylvania statute required the township board, when refusing to approve a subdivision plan, to cite the statutes or ordinances relied upon and describe the requirements which had not been satisfied. 411 A.2d at 841. A township board of commissioners had rejected a plat, citing three ordinances. The court found that two of the ordinances were simply inapplicable. *Id.* The third ordinance provided that a subdivision had to be coordinated with nearby developments or neighborhoods in order for the area as a whole to be developed harmoniously. *Id.* The

court concluded that this was too vague a requirement and directed that the preliminary plat be approved. *Id.* at 841, 843.

But Madison, Wis., Gen. Ordinances § 16.23(3)(a)3 is far more specific than the municipal ordinance the Pennsylvania court found wanting. Madison's ordinance refers to unsuitability due to "flooding, bad drainage, soil or rock formations with severe limitations for development, severe erosion potential, or unfavorable topography . . . ." The Madison Common Council's reasons for rejection were specific, referring to urban runoff, lawn chemicals, road salt, fractured bedrock, erodible soils, silt deposits and pollutants, loss of wildlife habitat and reduction of flora and fauna population. We conclude that the vagueness of the Pennsylvania ordinance is not replicated by sec. 16.23(3)(a)3, and that the Madison Common Council gave specific reasons for its rejection.

In *Carlson*, the town council denied a request to divide one lot into two lots based on "the best interests of the Town's citizens." 704 P.2d at 666. The court concluded that this was a vague reason, resulting in a decision that was arbitrary and capricious. *Id.*

The comparison of the reasons given by the Madison Common Council with the reason given by the Town of Beaux Arts Village leads to only one conclusion — the Madison Common Council was far more specific. River Ridge knows why the council rejected its preliminary plat, though it disagrees that the council's reasons were valid. The Madison Common Council rejection does not suffer from the same infirmity as the Town of Beaux Arts Village rejection.

■

We conclude that the common council's rejection of River Ridge's revised preliminary plat pursuant to

Madison, Wis., Gen. Ordinances § 16.23(3)(a)3 is supported in the record and is not arbitrary, unreasonable or discriminatory. We therefore need not address the other ten reasons the common council gave for its rejection of the plat.

*By the Court.*—Order affirmed.

SUNDBY, J. (*dissenting*). The City of Madison is the only approving authority, sec. 236.10(1)(b), Stats., which has rejected the River Ridge Run revised preliminary plat. The Town of Westport Town Board and the Dane County Agriculture, Environment and Land Division Committee have each conditionally approved the plat. Many of their concerns—provision of public sewer and water services, erosion control and stormwater detention, and preservation of Cherokee Marsh—are reasons given by the City of Madison Common Council for rejecting the River Ridge Run plat. I conclude that these concerns may be satisfied by the subdivider; therefore, the common council may not reject the River Ridge Run preliminary plat. Its appropriate action is to approve the plat, subject to conditions. I therefore dissent.

An approving authority may reject a preliminary plat, sec. 236.11(1)(a), Stats., only if the authority cannot obtain compliance with the requirements set forth in sec. 236.13, Stats., by imposing conditions for obtaining its approval. A preliminary plat is an offer submitted to the approving authority "for purposes of preliminary consideration." Section 236.02(9), Stats.

The idea behind the preliminary plat procedure is to allow the subdivider to submit a tentative plat to the approving authority to learn what objections the authority may have. The subdivider is then entitled to

an opportunity to correct, if possible, any objections an approving authority or objecting agency may have. This scheme was enacted by the legislature to meet concerns expressed to the Advisory Committee on Subdivision and Platting and the Judiciary Committee of the Wisconsin Legislative Council when ch. 236, Stats., was studied and revised in 1955. *See* Report of the Wisconsin Legislative Council, Volume IV, *Conclusions and Recommendations of the Judiciary Committee on the Subdivision and Platting of Land* (Jan. 1955). The judiciary committee and its advisory committee devoted most of their time to evaluating the burdens placed upon the subdivider with particular regard to the individual's right to the use of his or her land. *Id.* at 18 (Objective V). The judiciary committee noted that: "It is the practice of subdividers to submit preliminary plats to approving bodies prior to the preparation of a final plat to determine if the subdivider's proposed plan meets with the approval of the approving body before the expensive final plat is prepared." *Id.* at 19. The judiciary committee further stated that: "The purpose of a preliminary plat is to assure the subdivider that he is proceeding in an acceptable manner before he spends the money to have a final plat made. Present statutes require that the preliminary plat . . . comply with the same requirements as a final plat. *This defeats the purpose of having a preliminary plat.*" *Id.* at 20 (emphasis added).

I conclude, therefore, that the trial court's order should be reversed and this matter remanded to the common council with directions that it fashion appropriate conditions upon which final approval will be conditioned. Of course, if the council determines that its concerns cannot be met by the subdivider because the land is unsuitable for development, the council may

reject a preliminary or final plat for that reason. I do not believe the council had as yet made that determination. If the common council prohibits the division of River Ridge Run under sec. 236.45(2), Stats. (subdivision ordinance "may prohibit the division of land in areas where such prohibition will carry out the purposes of this section [236.45]"), River Ridge Joint Venture could maintain an action for inverse condemnation under sec. 32.10, Stats., if it believed it had been deprived of all, or practically all, economic use of its land. *See Reel Enters. v. City of La Crosse*, 146 Wis. 2d 662, 671, 431 N.W.2d 743, 747 (Ct. App. 1988) (citing *Just v. Marinette County*, 56 Wis. 2d 7, 15, 201 N.W.2d 761, 767 (1972)); *Lucas v. South Carolina Coastal Council*, 505 U.S. —, —, 120 L.Ed.2d 798, 813 (1992) (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)).

For the reasons I have expressed, I dissent.