WOODALL, Justice.
The Baldwin County Planning and Zoning Commission (“the Commission”) sought certiorari review of an opinion of the Court of Civil Appeals, upholding the trial court’s issuance of a writ of mandamus sought by Montrose Ecor Rouge, L.L.C. (“Montrose”), to compel the Commission to grant Montrose’s application for a proposed residential subdivision. We reverse and remand.

I. Factual and Procedural Background

Montrose owns a 7.98-acre parcel of land fronting on Mobile Bay. Montrose proposed to subdivide the parcel into 8 numbered lots, with lots 1 through 4 fronting Mobile Bay (“the bay lots”). Just behind the bay lots are lots 5 and 6, which are mainly composed of a cliff (“the cliff lots”). Just behind and above the cliff lots are lots 7 and 8. The parcel is subject to a rating scheme devised “[f]or purposes of flood insurance” by the Federal Emergency Management Agency (“FEMA”), reflecting the susceptibility of property to damage from “flooding and exposure to velocity-driven waves in a storm.” Baldwin County Planning & Zoning Comm’n v. Montrose Ecor Rouge, L.L.C., 68 So.3d 121, 124 (Ala.Civ.App.2010) (Per Bryan, J., with one judge concurring and three judges concurring in the result). More specifically,
“FEMA has rated a portion of the ... parcel as VE, has rated a portion of it as *136 AE, and has rated a portion of it as X. The portion of the ... parcel that is rated VE is coastal land that is subject to a high risk of flooding and is also subject to velocity-driven waves in a storm. [The bay lots] and the portion of [the cliff lots] closest to the bay ... [are] rated VE. The portion of the ... parcel that is rated AE is subject to a high risk of flooding but is not subject to velocity-driven waves in a storm.... [Portions of [the cliff lots] [are] ... rated AE. The portion of the ... parcel that is rated X is neither subject to a high risk of flooding nor subject to velocity-driven waves in a storm.... [Portions of [the cliff lots] and lots 7 and 8 [are] ... rated X.
“The FEMA ratings for the developer’s parcel are typical of the FEMA ratings for the eastern shore of Mobile Bay as a whole. FEMA regulations do not prohibit residential construction in areas rated VE or AE; however, they do impose special requirements on residential construction in such areas.”
Baldwin County, 68 So.3d at 124 (emphasis added).
In addition to these FEMA ratings, the parcel is subject to the Subdivision Regulations of Baldwin County (“the regulations”), which were adopted by the Baldwin County Commission pursuant to Ala. Code 1975, §§ 11-19-1 to -24, and Ala. Code 1975, §§ 11-24-1 to -7. The regulations “govern each and every subdivision of land in all unincorporated areas of Baldwin County.” Reg. § 2.2.
In November 2007, Montrose sought the Commission’s preliminary-plat approval for the subdivision and development of the parcel for residential purposes. The plat contemplated the construction of a roadway, which would serve as the sole means of ingress and egress for the bay lots. Although the road was to be elevated according to the specifications set forth Reg. § 5.3.18,[1] non-native fill material was to be imported to the site to serve as the roadway bed.
On January 17, 2008, at a Commission meeting (“the meeting”), Montrose presented its plat for approval. At the meeting, Baldwin County permit engineer, Gregory Smith, reported to the commissioners that the plat satisfied the “black and white technical requirements” for submission. Nevertheless, there was subsequent discussion at the meeting regarding the elevations of the roadway and the bay lots, and the susceptibility of the bay lots to flooding, particularly during landfalling tropical cyclones. A number of residents of the neighborhood in which the parcel was located attended the meeting. One or two of them presented photographs showing that the bay lots or adjacent areas had been thoroughly inundated twice in 2005 by two tropical cyclones of widely disparate intensity. Ultimately, the Commission denied approval of the plat on the ground that the plat failed to conform to certain of the regulations, including Reg. §§ 1.2.2, 5.1, and 5.2.2, inasmuch as the bay lots lie “in an area prone to severe flooding.” Those sections provide:
§ 1.2.2: “Land to be subdivided shall be of such character that it can be used *137 safely for building purposes without danger to health or peril from fire, flood, or other menace. Land shall not be subdivided until proper provision has been made for drainage, water, sewerage disposal and streets, and approval has been granted in accordance with the procedures prescribed in these regulations.”
§ 5.1. {Minimum Standards): “The following planning and standards shall be complied with, and no higher standard may be required by the County Commission, except where, because of exceptional and unique conditions of topography, location, shape, size, drainage, wetlands or other physical features of the site, minimum standards specified herein would not reasonably protect or provide for public health, safety, or welfare. Any higher standard required shall be reasonable and shall be limited to the minimum additional improvements necessary to protect the public health, safety, or welfare.”
§ 5.2.2 (Character of the Land): “Land which the ... Commission finds to be unsuitable for subdivision or development due to flooding, improper drainage, steep slopes, rock formations, adverse soil formations or topography, utility easements, or other features which will reasonably be harmful to the safety, health, and general welfare of the present or future inhabitants of the subdivision and/or its surrounding areas, shall not be subdivided or developed unless adequate methods are formulated by the applicant and approved by the ... Commission, upon recommendation of the County Engineer, or his/her des-ignee, to solve the problems created by the unsuitable land conditions; otherwise such land shall be set aside for uses as shall not involve such a danger. It is therefore recommended that the applicant perform any necessary site investigations related to items such as soils, wetlands, flooding, drainage, and natural habitats prior to submitting a Preliminary Plat for review.
[[Image here]]
“Land within any floodway shall not be platted for residential occupancy or building sites. Land outside the flood-way but subject to flood may be platted for residential occupancy provided each lot contains a building site that may reasonably lend itself to construction of a minimum floor level of one (1) foot above base flood elevation, or for such other uses which will not increase the danger to health, life, and property. Fill may not be used to raise land in the floodway. In other areas subject to flood, fill may be used providing the proposed fill does not restrict the flow of water and unduly increase flood heights.”
(Emphasis added.)
Montrose subsequently petitioned the Baldwin Circuit Court for a writ of mandamus directing the Commission to vacate its denial; to declare §§ 1.2.2., 5.1, and 5.2.2 unenforceable because, Montrose argued, the provisions are unconstitutionally vague; and to approve the preliminary plat. It also sought compensatory damages for alleged “lost profits, lost opportunity for the sale of subdivided lots, a decrease in market value, increased interest charges, [and] additional engineering costs.” The trial court denied Montrose’s request for damages, but, citing Smith v. City of Mobile, 374 So.2d 305 (Ala.1979), granted the petition in all other respects. The Commission appealed to the Court of Civil Appeals, and Montrose cross-appealed on the issue of damages.
*138 In a plurality opinion authored by Judge Bryan and joined by Judge Pittman, the Court of Civil Appeals, also citing Smith v. City of Mobile, affirmed the trial court’s issuance of the writ of mandamus. Judge Bryan’s opinion held:
“The challenged portions of the Subdivision Regulations are not reasonably definite and fixed in their requirements; to the contrary, they accord the Commission the discretion to treat similarly situated landowners differently. Accordingly, we conclude that they are void because they are impermissibly vague. See Smith v. City of Mobile[, 374 So.2d 305 (Ala.1979) ].”
Baldwin County Planning & Zoning Comm’n, 68 So.3d at 131 (emphasis added). However, on the cross-appeal, the Court of Civil Appeals reversed the damages portion of the judgment and “remanded] the action for the circuit court to determine the amount of damages [Mont-rose] is entitled to recover.” Baldwin County Planning & Zoning Comm’n, 68 So.3d at 132. As its sole authority for Montrose’s recovery of damages, the plurality cited Town of Gulf Shores v. Lamar Advertising of Mobile, Inc., 518 So.2d 1259 (Ala.1987). The Commission sought cer-tiorari review of both aspects of the plurality opinion. We granted the petition to consider (1) whether the plurality opinion of the Court of Civil Appeals conflicts with our precedent concerning the standard of review in a case such as this, and (2) whether Lamar Advertising should be overruled.

II. Discussion

A. Standard of Review

The broad, substantive issue, as acknowledged by a plurality of the Court of Civil Appeals, is whether § 1.2.2, § 5.1, and § 5.2.2 are unconstitutionally vague.
“‘The legislature has given the [Baldwin County Commission] the authority to regulate the development of subdivisions through its planning commission. [§§ 11-19-1 to -24; §§ 11-24-1 to -7], “Subdivision legislation is part of planning legislation, as is zoning; they are all predicated on the police power of the state.” ’ ” Beachcroft Props., LLP v. City of Alabaster, 949 So.2d 899, 904 (Ala.2006) (quoting City of Dothan v. Eighty-Four West, Inc., 822 So.2d 1227, 1236 (Ala.Civ.App.2001) (emphasis omitted)). “The governing body of a municipality, in considering a zoning ordinance, acts in a legislative capacity.... Because zoning ordinances are legislative acts, they are presumed valid unless they are shown to be arbitrary and capricious.” Woodard v. City of Decatur, 431 So.2d 1173, 1175 (Ala.1983).
“The standard of review in a zoning case is highly deferential to the municipal governing body. See American Petroleum Equip. & Constr., Inc. [v. Fancher;] 708 So.2d [129,] 132 [(Ala.1997) ] (‘Because the adoption of an ordinance is a legislative function, the courts must apply a highly deferential standard in zoning cases.’).
“ ‘ “[P]assage of a zoning ordinance is a legislative act, and it is well established that municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable.” Cudd v. City of Homewood, 284 Ala. 268, 270, 224 So.2d 625, 627 (1969).’
“Pollard v. Unus Props., LLC, 902 So.2d 18, 24 (Ala.2004).”
Ex parte Nathan Rodgers Constr., Inc., 1 So.3d 46, 49 (Ala.2008). In reviewing an ordinance against a challenge of unconsti *139 tutional vagueness, “[w]e must be certain that the ordinance is so plainly and palpably inadequate and incomplete as to be convinced beyond reasonable doubt that it offends the constitution or we will not strike it down.” Walls v. City of Guntersville, 258 Ala. 480, 485, 45 So.2d 468, 471 (1950). Courts should declare such an act to be void for vagueness only if the act is so indefinite that “a person of ordinary intelligence, exercising common sense [could] derive no rule or standard at all from the ... language,” or if it is so vague as to “authorize or encourage arbitrary and discriminatory enforcement.” Northington v. Alabama Dep’t of Conservation & Natural Res., 33 So.3d 560, 567 (Ala. 2009).
“When a challenged ordinance involves land use regulation, the ordinance is judged as applied, not evaluated for facial vagueness.” Swoboda v. Town of La Conner, 97 Wash.App. 613, 618-19, 987 P.2d 103, 106-07 (1999) (emphasis added). “Because the vagueness challenge is not based on the First Amendment, this Court examines ‘ “whether the statute is vague as applied to the conduct allegedly proscribed in this case,” ’ instead of hypothetical concerns.” Cadle Co. v. City of Kentwood, 285 Mich.App. 240, 259, 776 N.W.2d 145, 159 (2009) (quoting People v. Knapp, 244 Mich.App. 361, 374 n. 4, 624 N.W.2d 227 (2001), quoting in turn People v. Vronko, 228 Mich.App. 649, 652, 579 N.W.2d 138 (1998)(emphasis added)). “To make a successful facial challenge in a non-First Amendment context, a litigant ‘must establish that no set of circumstances exists under which the Act would be valid.’ ” Artway v. Attorney General of New Jersey, 81 F.3d 1235, 1253 n. 13 (3d Cir.1996) (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).
Montrose’s theory of the case is that the three regulations on which the Commission relied in rejecting the preliminary plat — §§ 1.2.2, 5.1, and 5.2.2 — are im-permissibly “vague as applied to Montrose because they [1] allow for the exercise of discretion [on the part of the Commission] and [2] fail to indicate to Montrose or any other applicant what is required in order to lawfully subdivide real property.” Montrose’s brief, at 43 (emphasis added). According to Montrose, the regulations are particularly offensive because they purport to regulate development in areas subject to “flooding.” Montrose’s position is that, because the Baldwin County Commission has not yet promulgated a regulation absolutely prohibiting development in areas subject to flooding, it must absolutely permit Montrose to develop its property in such an area.
The Commission contends, however, that “Baldwin County Subdivision Regulations §§ 1.22, 5.1, and 5.2.2 necessarily allow for discretion by the ... Commission regarding the extent the regulations apply to exceptional and unique conditions of ... flooding.” The Commission’s brief, at 8 (emphasis added). We agree. Case-law from Alabama and elsewhere compels us to reject the “all or nothing” approach to subdivision regulation urged by Mont-rose.
For example, in Ex parte City of Orange Beach Board of Adjustment, 833 So.2d 51 (Ala.2001), this Court reaffirmed the principle that an ordinance may validly delegate some discretion in its enforcement where “ ‘ “discretion relates to the administration of a police regulation and is essential to the protection of the public morals, health, safety, welfare, etc.’”” 833 So.2d at 54 (quoting Walls v. City of Guntersville, 253 Ala. at 485, 45 So.2d at 471). This reaffirmation was made in the context of our consideration of the constitutionality *140 of a nonconforming-use provision of an ordinance of the City of Orange Beach pertaining to signage. The ordinance authorized a “code-enforcement officer” for the City of Orange Beach Board of Adjustment to determine whether a billboard was “dilapidated” or “structurally unsound.” 833 So.2d at 52-53. The owner of two billboards contended that the use of those terms rendered the ordinance “unconstitutionally vague, overbroad, ambiguous, and arbitrary; and that the arbitrary and capricious enforcement of the ordinance ... deprived [the owner] of its constitutionally protected property rights.” 833 So.2d at 53. This Court disagreed, stating:
“In Walls v. City of Guntersville, [253 Ala. 480, 45 So.2d 468 (1950)], this Court addressed the constitutionality of a zoning ordinance that provided, in pertinent part:
“ ‘ “Any use whatsoever, not in conflict with any other ordinance of the City, is allowed in an Industrial District, provided that no use shall be permitted which would be offensive because of injurious and obnoxious noise, vibrations, smoke, gas, fumes, odors, dust or other objectionable features, or would be hazardous to the community on account of danger of fire or explosion.” ’
“253 Ala. at 484, 45 So.2d at 471. The ordinance further provided that its provisions would ‘be administered and enforced by the Mayor or the building inspector and or other person delegated by the Mayor to carry out this function for him.’ 253 Ala. at 484, 45 So.2d at 470-71. The challenger of the ordinance asserted that the ordinance was an unlawful delegation of power that vested in the delegated agency ‘an uncontrolled and arbitrary discretion ... to say what is or is not “offensive” within the meaning of the ordinance.’ 253 Ala. at 484, 45 So.2d at 471. This Court accordingly framed the relevant inquiry as ‘whether or not [the terms “injurious and obnoxious noise, vibrations, smoke, gas,” etc.] are so vague and indefinite as to furnish no standard of conduct by which the official in charge under the ordinance may be guided.’ 253 Ala. at 485, 45 So.2d at 471. In upholding the ordinance against the constitutional challenge and determining that its language did not contain ‘unusual or ambiguous expressions,’ this Court reasoned:
[[Image here]]
“ ‘ . [Ordinances need not always prescribe a specific rule of action ... some situations require the placing of some discretion in municipal officials, as in cases where it is difficult or impracticable to lay down a definite or comprehensive rule for guidance, or where the discretion relates to the administration of a police regulation and is essential to the protection of the public morals, health, safety, welfare, etc.[”]
[[Image here]]
“ ‘Provisions of such general nature as [in this ordinance] are not uncommon, but are usual in setting out the uses to which property in industrial zones may be restricted. These provisions are uniform in application, the standards set up are not so indefinite as to confer unlimited power and they relate directly to the health and public welfare.’
“253 Ala. at 485, 45 So.2d at 471 (citations omitted).”
Ex parte Orange Beach, 833 So.2d at 54 (emphasis added). We concluded that, “in the context of the ordinance, the terms ‘structurally unsound’ and ‘dilapidated’ [were not] impermissibly vague and ambiguous so that the ordinance [was] ‘plain *141 ly and palpably inadequate and incomplete.’ ” 833 So.2d at 56 (emphasis added).
A number of courts have reviewed ordinances functionally equivalent to § 5.2.2 and rejected challenges similar to those made here by Montrose. See, e.g., Jackson, Inc. v. Planning & Zoning Comm’n of the Town of Avon, 118 Conn.App. 202, 982 A.2d 1099 (2009); Burrell v. Lake County Plan Comm’n, 624 N.E.2d 526 (Ind.Ct.App.1993); Busse v. City of Madison, 177 Wis.2d 808, 503 N.W.2d 340 (Wis.Ct.App.1993).
Burrell involved “the denial of approval by the Lake County Plan Commission [ (‘the Plan Commission’) ] to the preliminary subdivision plan submitted by Donald and Alice Burrell.” 624 N.E.2d at 528. The area of the proposed subdivision was said to be subject to “substantial surface water runoff and flooding during normal rains,” and “excessive water runoff and flooding” during periods of heavy rain, while the soil was subject to the possibility of leaching and sewage elimination difficulties. 624 N.E.2d at 533 n. 8.
“The Burrells’ application was denied, consistent with the requirements of ... [Ordinance, § IV(B) ], based on the [Plan] Commission’s conclusion that the subdivision would have an adverse effect on the health, safety, and general welfare of the community.” 624 N.E.2d at 528. More specifically, § IV(B) of the Ordinance directed the Plan Commission to “deny preliminary plan approval ... ‘where a proposed subdivision would adversely affect the health, safety, or general welfare of the County.’ ” 624 N.E.2d at 528 (emphasis omitted). The Burrells challenged § IV(B) on the same grounds asserted by Montrose here, namely, that the regulation was “so vague and uncertain as to be unconstitutional and that it represented] an illegal delegation of legislative authority because it purported] to give the [Plan] Commission unlimited discretion.” 624 N.E.2d at 528 (emphasis added).
The Court of Appeals of Indiana rejected both these contentions. With regard to the unlimited-discretion argument, the court said:
“[T]he Ordinance specifically requires the [Plan] Commission to reject the application for preliminary plan approval when the proposal is not in compliance with the applicable ordinances or where the proposed subdivision would have an adverse effect on health, safety, or general welfare. Most importantly, this health, safety, and general welfare language does not stand alone. Another section of the Ordinance instructs the [Plan] Commission and property owners alike on the sorts of adverse effects that would properly serve as a basis for denial:
“ ‘1. Suitability of Land. No land shall be subdivided which is unsuitable for subdivision by reason of flooding, collection of ground water, bad drainage, adverse earth or rock formation or topography, or any feature likely to be harmful to the health, safety, or welfare of the future residents of the subdivision or of the community. Such lands shall not be considered for subdivision until such time as the conditions causing the unsuitability are corrected.’
“Ordinance § V(B)(1) (Record, p. 413)....
[[Image here]]
“It is well settled that discretion in the formulation of standards is to be exercised when an ordinance is created, rather than when an ordinance is applied .... Accordingly, we agree with the Burrells that the [Plan] Commission may not exercise the sort of discretion reserved to a legislative body enacting a law or ordinance to protect the health, *142 safety, and general welfare of the community, and that any attempt to delegate such broad authority would be improper. The question before us, then, is whether the health, safety, and general welfare language in [§ IV(B) ] improperly attempts to imbue the [Plan] Commission with legislative discretion or, instead, directs the [Plan] Commission to deny preliminary approval based on adverse effect to health, safety, and general welfare upon a determination that specified conditions exist. We believe the latter interpretation is the better view.
“Within the area of administrative law generally, the courts of this state have held that although a legislative body may not delegate the power to make a law, it may delegate to an administrative body the power to determine facts upon which the law’s action depends. State ex rel. Standard Oil Company v. Review Board of Indiana Employment Security Division (1951), 230 Ind. 1, 101 N.E.2d 60; Financial Aid Corp. v. Wallace (1939), 216 Ind. 114, 23 N.E.2d 472. In other words, ‘a legislative body may enact a law, the operation of which depends upon the existence of a stipulated condition, and ... it may delegate to a ministerial agency power to determine whether the condition exists.’ Campbell v. Heiss (1944), 222 Ind. 297, 302, 53 N.E.2d 634, 636. A planning commission’s review of a subdivision plan to determine if the plan is in compliance with the applicable statutes and ordinances is a form of exercising delegated authority to make factual determinations within the guidelines established by a legislative body.
“We reiterate that the Ordinance involved here does not give the [Plan] Commission unguided discretion to determine what conditions are adverse to the health, safety, and general welfare of the community. Instead, § V(B)(1) ..., reproduced supra, provides that property subject to specified adverse conditions may not be subdivided. The function of reviewing evidence in connection with an application for preliminary plan approval for the purpose of determining whether those adverse conditions exist does not constitute an improper delegation of legislative authority to the [Plan] Commission. We view [§ IV(B) ] as merely directing the [Plan] Commission to make a factual determination on whether specific conditions exist that render property unsuitable for subdivision (e.g., flooding, bad drainage, adverse topography) and to deny subdivision plan approval based on health, safety, and general welfare where those conditions are found to exist. Accordingly, we find that the health, safety, and general welfare standard of which the Burrells complain does not represent an improper delegation of legislative authority because the Ordinance provides guidelines regarding those characteristics considered adverse to the community.”
624 N.E.2d at 530-32 (emphasis added). In short, that court concluded that any impermissible vagueness or potential for arbitrary discretion that might have inhered in § IV(B) was cured by the guidelines in § V(B)(1).[2]
*143 Section § 5.2.2 is similar to § V(B)(1) of the Ordinance at issue in Burrell: it vests in the Commission the authority to “find” that development on land in certain flood-prone areas could “reasonably be harmful to the safety, health, and general welfare of the present or future inhabitants of the subdivision and/or its surrounding areas.” (Emphasis added.)
It is undisputed that the bay lots are in a “flood-prone” area, as that term is defined by Ala.Code 1975, § 11-19-1(3) (“Any area with a frequency of inundation of once in 100 years as defined by qualified hydrologists or engineers using methods that are generally accepted by persons engaged in the field of hydrology and engineering.”). The Commission contends that legislature has granted it “broad authority to regulate development in unincorporated flood-prone areas of Baldwin County” and that “[discretion is a necessary component [of such authority] due to the multitude of factors that affect whether developing in a [flood-prone area] would create an unacceptable risk.” The Commission’s brief, at 18.
Indeed, the purpose and intent of the Alabama legislature in enacting Title 11, Chapter 19, of the Code of Alabama 1975, entitled “Comprehensive Land-use Management in Flood-prone Areas” (hereinafter referred to as “the Act”), is clearly set forth:
§ 11-19-2, Ala.Code 1975: “It is the declared purpose of this chapter to provide in each county of this state a comprehensive land-use management plan by:
“(1) Constricting the development of land which is exposed to flood damage in the flood-prone areas;
“(2) Guiding the development of proposed construction away from locations which are threatened by flood hazards;
“(3) Assisting in reducing damage caused by floods; and
“(4) Otherwise improving the long-range management and use of flood-prone areas.”
§ 11-19-3, Ala.Code 1975: “The county commission in each county of this state is hereby authorized and may adopt zoning ordinances and building codes for flood-prone areas which lie outside the corporate limits of any municipality in the county.
“Each such county commission shall have broad authority to:
“(1) Establish or cause to be established comprehensive land-use and control measures which shall specifically include the control and development of subdivisions in flood-prone areas;
[[Image here]]
“(6) Employ such technical and/or advisory personnel, including the establishment of a county planning commission, as is deemed necessary or expedient; and
“(7) Adopt ordinances for the enforcement of all such regulations.”
§ 11-19-4, Ala.Code 1975: “Land-use and control measures shall provide land-use restrictions based on probable exposure to flooding. Measures specified in this section shall:
“(1) Prohibit inappropriate new construction or substantial improvements in the flood-prone areas;
"... [and]
“(6) Prescribe such additional standards as may be necessary to comply with federal requirements for making flood insurance coverage under the *144 National Flood Insurance Act of 1968 available in this state.”
§ 11-19-5, Ala.Code 1975: “In addition to land-use restrictions commensurate with the degree of the flood hazards in various parts of the area, there shall be such subdivision regulations as may be necessary:
“(1) To prevent the inappropriate development of flood-prone lands;
“(2) To encourage the appropriate location and elevation of streets, sewers and water systems and the reservation of adequate and convenient open space for utilities; [and]
“(3) To provide for adequate drainage so as to minimize exposure to flood hazards and to prevent the aggravation of flood hazards.... ”
(Emphasis added.)
Contrary to the “all or nothing” approach espoused by Montrose, the legislature specifically authorized planning commissions to “[pjrohibit inappropriate ... construction ... in the flood-prone areas” (§ 11-19^4), through implementation of the “land-use and control measures” established under the “broad authority” conferred on county commissions (§ 11-19-3). In other words, although some development in flood-prone areas may be permitted as appropriate, development in such areas shall be denied where it is deemed by the relevant planning authority to be “inappropriate.” That is precisely the scenario contemplated by §§ 1.2.2, 5.1, and 5.2.2.
As we explained previously in this opinion, “ ‘ “some situations require the placing of some discretion in [enforcement] officials, as in cases where it is ... impracticable to lay down a definite or comprehensive rule for guidance, or where the discretion relates to the administration of a police regulation and is essential to the ... health, safety, welfare, etc.” ’ ” Ex parte City of Orange Beach Bd. of Adjustment, 833 So.2d at 54 (quoting Walls, 253 Ala. at 485, 45 So.2d at 471). The Commission contends, and we agree, that it would be impracticable, if not impossible, for the Baldwin County Commission to promulgate regulations that could address “the multitude of variables [involved] in determining whether development in a flood zone presents an unreasonable risk to public health and safety.” The Commission’s brief, at 21. Such an approach was not mandated by the legislature or attempted by the Baldwin County Commission.
Instead, §§ 1.2.2, 5.1, and 5.2.2 direct the “Commission to make a factual determination [as to] whether specific conditions exist that render property unsuitable for subdivision.” 624 N.E.2d at 532. This determination is circumscribed further by the requirement that prohibited development be such as could “reasonably be harmful to the safety, health, and general welfare of the present or future inhabitants of the subdivision.” § 5.2.2 (emphasis added). In other words, the regulation— written as it is in the conjunctive—inextricably links considerations of “general welfare” to the more objectively reviewable concepts of safety and health. Thus, it is not clear beyond a reasonable doubt that §§ 1.2.2, 5.1, and 5.2.2. vest in the Commission the type of arbitrary discretion to deny Montrose’s preliminary plat that is prohibited under Alabama law.
Neither do those sections deprive Montrose of notice as to “what is required in order to lawfully subdivide [its] real property.” See Montrose’s brief, at 43. The Act authorizes the Baldwin County Commission to address the “great financial and economic loss [and] human suffering, caused by floods and flooding” through *145 regulatory action designed to “guide” and “constrict” development of land-use and development in the unincorporated, flood-prone areas of the county. § 11-19-2. Section 11-19-1(2) of Act defines “flood or flooding” as “[t]he general and temporary condition of partial or complete inundation of normally dry land areas[ ] ... a. [f]rom the overflow of streams, rivers, and other inland waters, or b. [fjrom tidal surges, abnormally high tidal waters, tidal waves, or rising coastal waters resulting from tsunamis, hurricanes, or other severe storms.” (Emphasis added.) Similarly, § 3.2 of the regulations defines “flood or flooding” as “[a] general and temporary condition of partial or complete inundation of normally dry land areas from[ ] (a) the overflow of inland or tidal waters; [or] (b) the unusual and rapid accumulation of runoff of surface waters from any source.” (Emphasis added.)
Both the Act and the regulations thus specifically address the overflow of “tidal waters,” which commonly accompanies the landfall of tropical cyclones. The susceptibility of the bay lots to flooding from tidal waters was well known to residents of the locality and was a matter of considerable discussion at the Commission’s meeting on Montrose’s development plan. In connection with the overflow of tidal waters, the bay lots were — as indicated by FEMA’s VE classification — subject to wind-driven waves.
Montrose attempts to make much of Smith’s statements that the plat satisfied the “black and white technical requirements” for submission to the Commission. However, Smith also stated at the meeting — and correctly so — that ultimate decisions as to suitability based on § 5.2.2. were reserved for the Commission, not a county engineer. See, e.g., Reg. § 4.1 (“no subdivision plat of land ... shall be filed or recorded ... until the plat shall have been submitted to and approved by the County Planning Commission”).
Indeed, Smith stated without contradiction in the trial court that he had always had misgivings about the structural integrity of the proposed elevated roadway that was to serve the subdivision because of the composition of the non-native fill material Montrose proposed to use to elevate the roadbed. Specifically, he explained that such material would likely not withstand the wind-driven waves that the area was known to experience. With the roadway thus washed out, the residents’ only means of escape from rising tidal surge would be lost.
This concern was expressed by at least one of the zoning-board commissioners at the meeting. Even before the meeting, the County’s concern over the structural integrity of the roadway as platted had prompted the County to decline to accept responsibility for its maintenance. This declination was known to Montrose before it submitted its preliminary plat. In the trial court, Montrose’s engineer expressed the view that tidal surge would not pose a danger to subdivision residents, because, he “assume[d],” the residents would evacuate. This Court, however, takes judicial notice of the fact that residents in the paths of tropical cyclones often fail to heed evacuation orders in a timely manner.
Under the circumstances here presented, Montrose could reasonably have known that “exceptional and unique conditions of topography,” § 5.1, would render the bay lots “unsuitable for subdivision ... due to flooding,” absent the formulation of “adequate methods ... to solve the problems,” § 5.2.2, associated with an uncertain exit route. It could reasonably have anticipated that, “because of [the] exceptional and unique topography” of the bay lots, “minimum standards specified [in the regulations] would not reasonably,” § 5.1, assure *146 that the residents of the proposed subdivision would not be stranded in the path of a hurricane or other tropical cyclone.
Indeed, Montrose has always known that one of the Commission’s main concerns about its proposed subdivision centered on the danger to the bay lots of flooding, in particular that species of flooding known as tidal surge. There was no confusion at the meeting that tidal surge was at issue. Thus, it is not clear beyond a reasonable doubt that §§ 1.2.2, 5.1, and 5.2.2., construed together, do not apprise Montrose[3] of notice as to “what is required in order to lawfully subdivide [its] real property.”[4]
Smith v. City of Mobile, 374 So.2d 305 (Ala.1979), on which the lower courts relied, is clearly distinguishable and does not counsel a different result. Indeed, that case did not directly involve the issue, here presented, regarding the deference to be exercised in reviewing subdivision regulations for vagueness. There, the Mobile City Planning Commission (“the Planning Commission”) denied an application for a proposed subdivision on the ground “that ‘the lots would be out of character with the other lots in the area.’ ” 374 So.2d at 306. As support for its denial, the Planning Commission cited “Section V(D)(1) of the Planning Commission Subdivision Regulations,” which stated: ‘“The size, width, depth, shape and orientation of lots and the minimum building setback lines shall be appropriate to the location of the subdivision and the type of development and use contemplated. Every lot shall contain a suitable building site.’ ” 374 So.2d at 307. The Planning Commission, however, was ignoring more particularized sections of its subdivision regulations, which set forth “specific criteria regarding minimum lot size, maximum depth, position of lots in relation to streets, etc.” 374 So.2d at 309.
After a general discussion of the well recognized need for specificity in land-use regulations, this Court declined the Planning Commission’s invitation to ignore the more specific sections of the regulations, stating:
“To construe the provisions of Section V(D)(1), as appellees urge, as being synonymous with ‘out of character with other lots in the area’ would be to ignore the specific criteria which follow it and vest a discretion in the Planning Commission which is unguided by uniform standards, and capable of arbitrary application. ...
“The Planning Commission’s denial of approval of [the subdivision] on the grounds that it was ‘out of character with other lots in the area’ was unrelated to its conformance with the Planning Commission’s own regulations and exceeded its statutory grant of power.”
374 So.2d at 309.
This case is actually the converse of Smith. While the Planning Commission in Smith sought to ignore specific regulatory provisions that would circumscribe its discretion, the Commission in this case embraces such limiting provisions, namely, *147 the particularized type of flood hazard involved, as defined in § ll-19-l(2)(b), Ala. Code 1975, and Reg. § 3.2; with the further limitation that the hazard “reasonably be harmful to the safety, health, and general welfare of the present or future inhabitants of the subdivision.” Section 5.2.2. Although the reason for disapproval involved in Smith bore no relationship to “safety” or “health,” the Commission’s position is that any development of the bay lots must incorporate a reliable means of ingress and egress from the property in the event of a tropical cyclone. For these reasons, we hold that Montrose was not entitled to a writ of mandamus compelling the Commission to approve its preliminary plat.
B. Damages Pursuant to Lamar Advertising
This holding obviates the need to address the issues whether Montrose is entitled to damages and whether Lamar Advertising, on which the plurality opinion of the Court of Civil Appeals based its remand for a determination as to damages, should be overruled.

III. Conclusion

The manner in which the plurality opinion of the Court of Civil Appeals reviewed §§ 1.2.2., 5.1, and 5.2.2. conflicts with the “highly deferential standard” required by Alabama caselaw. Consequently, the judgment of that court is reversed, and the cause is remanded to that court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
COBB, C.J., and LYONS, SMITH, PARKER, MURDOCK, and SHAW, JJ., concur.
BOLIN, J., concurs in the result.

. Reg. § 5.3.18 ("Street Elevations”) provides:
"The Planning Commission may require, where necessary, profiles and elevations of streets for areas subject to flood. No street shall be approved for construction within an area subject to flood that is proposed to be constructed more than 2 feet below the elevation of the base flood, as defined in these regulations. Fill may be used for streets. Drainage openings shall be so designed as not to restrict the flow of flood waters or increase upstream flood heights.”

. Regarding the Burrells’ lack-of-notice argument, the Court of Appeals of Indiana concluded that, because of the guidelines contained in § V(B)(1), namely, " ‘flooding, collection of ground water, bad drainage, adverse earth or rock formation or topography, or any feature likely to be harmful to the health, safety, or welfare of the future residents of the subdivision,’ ” the regulations ”provid[ed] ample notice to landowners of those conditions that [would] be evaluated by the [Plan] Commission.” 624 N.E.2d at 530.

. Because we review these land-use regulations for vagueness only as applied to Mont-rose, and because this case is primarily about the possible flooding from tidal surge, Mont-rose may not challenge non-flood aspects of the regulations, definitions of flooding in general, or flooding from hypothetical potential sources.

. We also note that "[i]f one of the [Commission’s] reasons for rejecting the plat is adequate, whether the other reasons are valid is irrelevant.” Busse v. City of Madison, 177 Wis.2d 808, 813, 503 N.W.2d 340, 342 (Wis. Ct.App.1993) (emphasis added). See also Wolff v. Mooresville Plan Comm’n, 754 N.E.2d 589, 592 (Ind.Ct.App.2001) ("The Commission’s decision will be sustained if it was correct on any grounds stated for disapproval of the [plat].”).